INSURANCE COMPANY OF NORTH AMERICA, Plaintiff-Appellee,

v.

Bernt MEYER et al., Defendants,

Earl Wayne King, Defendant-Appellant,

Otis L. Bennett and Georgia Casualty and Surety Company, Defendants-Appellees.

No. 77–1642

Summary Calendar.*

United States Court of Appeals, Fifth Circuit.

Jan. 12, 1978.

* Rule 18, 5 Cir.; see Isbell Enterprises, Inc. v. Citizens Casualty Co. of New York et al., 5 Cir., 1970, 431 F.2d 409, Part I.

John Wright Jones, W. Jan Jankowski, Savannah, Ga., for defendant-appellant.

Charles B. Mikell, Jr., Savannah, Ga., for Insurance Co. of North America.

James E. Yates, III, Savannah, Ga., for Bennett and Georgia Casualty & Surety.

Before GOLDBERG, CLARK, and FAY, Circuit Judges.

PER CURIAM:

This diversity case is an appeal from a summary judgment in a dispute about insurance coverage. Since an important issue of Georgia law for which there is no controlling precedent controls the outcome, we defer decision and certify the controlling question to the Supreme Court of Georgia. *See In re McClintock*, 558 F.2d 732 (5th Cir. 1977).

As the joint statement of facts in the Certificate indicates, the judgment below determined that Bernt Meyer, the alleged tort-feasor, was not an insured either under an automobile liability policy issued to him by the Insurance Company of North America [INA] or under a garage liability coverage provision of a policy issued to Otis Bennett, the bailee of the automobile Meyer was driving, by Georgia Casualty & Surety Company [Georgia Casualty]. Earl Wayne King, the injured party, has raised several issues in his appeal of the district court's judgment. Although Georgia law and the language used in the policies themselves permit decision of most of these issues, there is one provision in the policy INA issued to Meyer which appears to depend upon the public policy of the forum state and has not been interpreted by the Supreme Court of Georgia. Accordingly, we certify to the Supreme Court of Georgia the issue whether Meyer was covered because of the "reasonably believed to be with the permission of the owner" language in the "non-owned automobile" coverage section of his policy with INA. The remaining issues in the pending appeal will be reached after the Supreme Court of Georgia has acted.

Following our practice, we requested that the parties submit a proposed agreed statement of the case and certificate of issues for decision. They have reached agreement, with one exception, on the proposed statement of the facts, and that agreed statement together with the exception is made a part of the Certificate. Since the parties evidently misunderstood the intended limited scope of the Certificate we envisioned and were unable to agree on the question to be certified, we have composed a question which appears to us to dispose of the issue presented. Of course, we do not intend the issue as stated to restrict the Georgia Supreme Court, in its reply, to the precise form or scope of the question presented. *See In re McClintock*, 558 F.2d 732, 735 (5th Cir. 1977).

## QUESTION CERTIFIED

CERTIFICATE FROM THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT TO THE SUPREME COURT OF GEORGIA, PURSUANT TO GEORGIA CODE ANNOTATED § 24-3902

To the Supreme Court of Georgia and the Honorable Justices thereof:

It appears to the United States Court of Appeals for the Fifth Circuit that the above-styled case involves a question or proposition of the law of the State of Georgia which is determinative of the cause, and there appear to be no clear, controlling precedents in the decisions of the Supreme Court of Georgia. This court certifies the following question of law to the Supreme Court of Georgia for instruction concerning said question of law, based on the facts recited herein, such case being on appeal from the United States District Court for the Southern District of Georgia.

### *Joint Statement of Facts*

Otis L. Bennett operates a sole proprietorship in Savannah known as the "Bennett

Motor Company." Bennett Motor Company is engaged in the business of buying and selling used cars and making minor repairs. As an incident of his business, Bennett allows third parties to leave their cars on his premises.

Bennett's residence and place of business are located on contiguous tracts of land. The residence is located about 100 yards from the place where vehicles are exhibited for sale. Automobiles are usually parked at both areas and at most areas in between. Bennett allows banks, finance companies, and others to leave their cars with him without charge because it provides him with ready access to automobiles for his own used car lot and saves him the inconvenience of traveling about to locate vehicles to bid on.

Bennett customarily distinguishes in his parking plan among cars for his personal and family use, cars held in his inventory for resale, and cars left by third parties or left for repairs. Personal cars are usually parked in front of his residence; cars for sale are parked on the "lot" fronting on the highway; cars belonging to third parties are usually parked in the area between the used car lot and the residence. There is no evidence as to the usual parking place of cars left for repairs. Cars left by third parties were parked by the third parties themselves. The ownership of the various cars could not be visually determined.

Individuals and financial institutions which left vehicles with Bennett placed their keys on a key board in the Bennett Motor Company office. It was Bennett's policy to place his own keys on the higher rows of the key board and to allow others leaving cars with him to use the bottom rows. There was no notice on the key board to indicate a distinction as to the use of the higher and lower key rows. There was no lock to prevent access to the key board by third parties.

Bennett Motor Company's inventory records of automobiles held for sale are maintained by placing in individual envelopes the title to vehicles purchased without having the title transferred into Bennett's name. Bennett's insurance carrier is not notified when each automobile is purchased. Bennett often placed a pasteboard Bennett Motor Company tag on automobiles when they needed to be driven on the public streets. Bennett occasionally allowed customers who had purchased cars from him to use one of his own while the customer's car was being repaired or readied for delivery.

Two of Bennett's regular customers were L. S. Murray and Bernt Meyer. Although both were friends of Bennett, neither was acquainted with the other prior to this litigation. In September of 1975, Bennett sold Murray a Ford Pinto stationwagon in a wrecked condition. The Pinto had an expired 1974 Georgia license tag, which was covered at all times material to this litigation by a cardboard tag reading "Another Good Deal, Bennett Motor Company, License Applied For, Savannah, Georgia." Murray did not insure the Pinto, never had the Pinto's title transferred into his own name nor paid any taxes on it even though he paid Bennett $1,200 for the car and received the title certificate.

In 1976, about three months prior to the collision which gave rise to this litigation, Murray required hospitalization. Before entering the hospital, he drove the Pinto to Bennett's premises, 18 miles from Murray's home, because he desired to find a safe place to leave the Pinto to protect it against vandalism during his hospitalization. After Murray's release from the hospital, the car remained on Bennett's property because "I hadn't never decided what I was going to do with it."

Murray parked the vehicle himself, at the rear of the premises in front of Bennett's residence without any charge. Bennett instructed Murray to leave the keys on the key board in the Bennett Motor Company office. This was the only set of keys to the Pinto. He stated, "Just hang them up there and it'd be . . . take care of it for me." Murray gave Bennett only limited

permission to use the Pinto: permission to move it if it got in the way. Murray authorized no one to drive the car.

Bennett's other friend and customer, Bernt Meyer, approached Bennett in September of 1976 to discuss purchasing a used Lincoln Continental Mark IV. The Lincoln needed some repairs and the parties discussed Meyer's possible need for temporary transportation. Meyer's recollection was:

A. My testimony is that during the negotiation I said how long is it going to take to get it [Mark IV] fixed and he said possibly a week or so and I said well, you know I hate to go out and buy a car and not have one to drive. He said you've never had to walk yet have you, something of that nature.

Bennett had on at least two prior occasions loaned his cars to Meyer for personal use. However, Meyer had on each prior occasion obtained Bennett's express permission. Bennett had on previous occasions allowed customers who had purchased cars from him to use one of his own while their cars were being repaired or readied for delivery. Bennett denied ever allowing anyone to borrow one of his cars without his specific permission.

The purchase of the Mark IV by Meyer was consummated on September 15, 1976. Meyer telephoned his insurance carrier [INA] and had the Mark IV listed as an insured vehicle on his policy. The Mark IV was in need of repairs and was, immediately after its purchase, left at Bennett's for that purpose. Because the Mark IV was not drivable and was retained in Bennett's garage for repairs, Meyer was in need of some transportation.

Otis Bennett was in the hospital the afternoon of September 15, 1976, and consequently absent from the business premises. In Bennett's absence, Meyer selected the Pinto to fulfill his need for transportation. The district court acknowledged Meyer's good faith in selecting the Pinto. Meyer testified that he took the Pinto because "Mr. Bennett had told me I could use a car while I was getting this one [Mark IV] fixed if I needed it." * "It was parked right by Mr. Bennett's house and thought that it was probably his car."

Meyer testified as follows:

"I went in the office and there was nobody in there except old man Russell, he's a salesman out there, and an elderly gentleman. I said hello, went in the back and looked back toward Otis' [Bennett's] house to see what was parked back there because that's usually where he keeps cars that are his and things that are not for sale and saw the Pinto back there, and looked on the board under Pintos and

---

* INA has a minor disagreement with the proposed joint statement of facts at this point. It is true that the quoted statement is in evidence. The statement was:

Q. Why did you take the Pinto?
A. Because Mr. Bennett had told me I could use a car while I was getting this one fixed if I needed it.

INA feels that this statement, taken out of context, may be misleading to the Georgia Court in view of the following clarification on cross-examination:

RE–EXAMINATION OF
MR. MEYER BY
MR. MIKELL:

Q. I have one more question. I believe you testified, correct me if I am wrong, that Mr. Bennett had told you explicitly on this occasion while you were negotiating about the Mark IV, that you did have permission to take the car if it were necessary while the Mark IV was getting fixed. Is that your testimony?
A. My testimony is that during the negotiation I said how long is it going to take to get it fixed and he said possibly a week or so and I said well, you know I hate to go out and buy a car and not have one to drive. He said you've never had to walk yet have you, something of that nature. So you know—
Q. You took this as implied permission to—
A. I took this as implied permission to drive the automobile; of course also he knew that I had the Jordan Equipment Company vehicles at my disposal, so he may have intended me to continue to drive the station wagon or the pickup truck or the other station wagon or something like that. I really don't know what was in his mind.

Finally, King points out that Meyer concluded this last answer with "You would have to ask him [Bennett] that."

found the keys. Took the Pinto and went off."

". . . it had a paper tag on it . . Bennett Motor Company. The reason for the paper tag being on there, it had a 1975 Georgia tag on it and it had expired and I assumed the car had been sitting there for some time, so they put a paper tag on it because it wasn't being used . . . if you are going to move one around at all you have got to have some sort of tag on it . . . He [Bennett] usually puts one on any car that's got an expired tag on it."

". . . I didn't have any feeling about the car [Pinto] at all. I was simply stranded there because I brought the car [Mark IV] back because I didn't have anybody to come and get me and I needed an automobile and because of my past relationship with Mr. Bennett, I didn't think he would have any objection to my taking the automobile and I selected one [Pinto] that I thought would be least likely to interfering with his business. Primarily when I get an automobile from him [Bennett], I have always taken something that is not likely to be sold. I don't want to go out there and after all he makes his living selling automobiles and I don't want to go out there and take something that he's got on his lot for sale and ruin a chance for him selling an automobile by me taking the car off and driving it."

Meyer used the Pinto to complete some personal errands around Savannah and then drove it to South Carolina to visit some friends near Hardeeville. That evening, while turning into their driveway, he collided with a motorcycle being driven by the Appellant, Earl Wayne King. King was injured and sued Meyer. INA questioned the coverage and brought this declaratory judgment action.

Otis Bennett was issued by Georgia Casualty a policy of insurance which included garage liability coverage.** Meyer was the named insured in a policy of auto liability insurance issued by INA which was in effect on September 15, 1976. The pertinent sections of this policy are:

"To pay on behalf of the Insured all sums which the Insured shall become legally obligated to pay as damages because of:

(a) bodily injury, sickness, disease, including death resulting therefrom, hereinafter called 'bodily injury', sustained by any person; and

(b) omitted

arising out of the ownership, maintenance or use of the owned automobile or any non-owned automobile . . ."

"PERSONS INSURED"

"The following are Insureds under Bodily Injury and Property Damage Liability Coverage:

(a) With respect to the owned automobile.

(1) the Named Insured and any resident of the same household,

(2) any other person using such automobile with the permission of the Named Insured, provided his actual operation or (if he is not operating) his other actual use thereof is within the scope of such permission, and

(3) omitted.

(b) with respect to a non-owned automobile,

(1) The named Insured,

(2) any relative, but only with respect to a private passenger automobile or trailer,

provided his actual operation or (if he is not operating) the other actual use thereof is with the permission or *reasonably believed to be with the permission of the owner, and is within the scope of such permission*, and (emphasis added),

---

** The relevant provisions of this policy, included in the joint statement of facts submitted by the parties, are omitted here since the interpretation of this policy is not the subject of this Certificate. In addition, the final paragraph of the joint statement detailing the district court's holding that Meyer was not covered by this policy is omitted.

(3) omitted . . ."

" 'owned automobile' means

(a) omitted

(b) omitted

(c) omitted

(d) a temporary substitute automobile; 'temporary substitute automobile' means any automobile or trailer not owned by the Named Insured, while temporarily used with the permission of the owner as a substitute for the owned automobile or trailer when withdrawn from normal use because of its breakdown, repair, servicing, loss or destruction;

'non-owned automobile' means an automobile or trailer not owned by or furnished for the regular use of either the Named Insured or any relative, *other than a temporary substitute automobile.*" (Emphasis added).

On the motions for summary judgment filed by INA and Georgia Casualty, the United States District Court for the Southern District of Georgia ruled that Meyer was not an insured under either policy of liability insurance. The District Court ruled that the Pinto was a "temporary substitute" for Meyer's Mark IV but not covered within section "a" under "PERSONS INSURED" of INA's policy because it was not "used with the permission of the owner." The District Court also held that the Pinto was not covered within section "b" under "PERSONS INSURED" of INA's policy because the Pinto was not used "with the permission or reasonably believed to be with the permission of the owner." The Court held that "owner" means the actual and not the putative owner of the automobile. Moreover, the District Court felt that the applicability of the "non-owned" vehicle coverage to this case was "very dubious."

## QUESTION FOR THE GEORGIA SUPREME COURT

If the named insured operates a non-owned vehicle under the reasonable belief that he has the permission of someone whom he reasonably, but mistakenly, assumes to be the owner, is he covered by an automobile liability policy that extends coverage to the named insured with respect to a non-owned automobile when the insured's operation thereof is "with the permission or reasonably believed to be with the permission of the owner"? For the purposes of this question, it is assumed that the "non-owned automobile" provisions of the automobile liability policy are not otherwise inapplicable to this case.

The entire record in this case, together with copies of the briefs of the parties, the letter directive, and proposed certification with differences are transmitted herewith.

CERTIFIED.

## CERTIFIED QUESTIONS PROPOSED BY APPELLANT EARL WAYNE KING

1. Does the phrase "reasonably believed to be with the permission of the owner," contained in INA's non-owned automobile coverage, include consent of the possessor of the automobile, as long as the borrower reasonably believes that the possessor is the owner or has the permission of the owner to lend the automobile to third parties?

2. Does the phrase "reasonably believed to be with the permission of the owner," contained in INA's non-owned automobile coverage, contemplate simple permission, express or implied, as conventionally understood, or does the term purport to expand coverage to the named insured in circumstances where he cannot readily be sure as to the scope of insurance coverage on the non-owned vehicle being driven or as to the extent of the authority of the person permitting him to drive such non-owned vehicle?

## CERTIFIED QUESTIONS PROPOSED BY APPELLEE, INA

1. The Appellee, INA, disagrees with the phrasing of Appellant's proposed first

and second questions. Both questions reflect one issue, Judge Lawrence's ruling that the phrase "reasonably believed to be with the permission of the owner" requires some reason to believe in the permission of the actual owner and not in that of a putative or supposed owner. This issue is not germane at all unless the Georgia Court first rules against INA on a threshold issue—whether the "non-owned" coverage is even applicable. INA suggests a question for that issue in paragraph 2. below. As an alternative to both of Appellant's initial questions, INA suggests the following phrasing on the "non-owned" coverage issue:

> Assuming that the "non-owned automobile" provisions are applicable to this case, is the named insured in an automobile liability policy covered while operating a vehicle as to which he subjectively believes he has the permission of someone he mistakenly assumes to be the owner or must he have objective reasons to believe that he has the permission of the actual owner?

It is clear that there may really be two variables here—whether the test if subjective or objective and whether the test applies to the real or a putative owner. But the Georgia Court may feel that the two issues are one if they adopt the Appellant's arguments for a subjective view. INA's version focuses on the precise point in dispute; the Georgia Court could rephrase or expand this wording if they perceive the issue differently. The legal point is raised by Judge Lawrence on pages 10 and 14 of his opinion and by Appellant's brief, pages 23 et seq.

INA's version avoids the complicating problem of determining when summary judgment is and is not appropriate. Logically, summary judgment is appropriate if Georgia law requires some objective reasons for the belief or if it requires a belief directed towards the actual owner. A jury question might be presented if the reasonableness of subjective beliefs is determina-

tive. In both the Federal Courts and Georgia Courts, the principles governing summary judgment are well settled. Thus there is no need to ask for guidance here.

## STATEMENT OF POSITION OF APPELLANT EARL WAYNE KING

In response to the statements of INA contained in its proposed list of questions for certification to the Supreme Court of Georgia, and pursuant to agreement of counsel, Appellant Earl Wayne King respectfully files the following comments in an effort to clarify his position and the reasoning behind the selection of Appellant's proposed questions for certification.

### QUESTION 1

Question one is designed to raise the question of whether the actual or assumed owner is contemplated in INA's policy language. This question was squarely raised in the Trial Court and on appeal.

### QUESTION 2

Question two is designed to consider the issue of whether the traditional scope of permission required in automobile cases is intended to be broadened by the use of the "reasonably believed" language in INA's policy. The issues raised by both questions one and two center around the use of the "reasonably believed" language. It should be noted that the language modifies both the terms "permission" and "owner" and, therefore, both questions need to be asked as separate questions to insure that both aspects of the issue are properly considered by the Georgia Supreme Court. Both question one and two closely follow the wording of the same issues as raised and considered by the Supreme Court of New Jersey in *State Farm Mutual Auto Insurance Company v. Zurich American Insurance Company*, 62 N.J. 155, 299 A.2d 704, 711, the only court that has apparently construed this precise language.